This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Plaintiff-Appellant Amitron Corporation ("Amitron") has appealed from a judgment of the Summit County Court of Common Pleas that dismissed its claim against Defendant-Appellee Continental Plants Corporation ("Continental") and entered judgment in favor of Defendant-Appellee Saturn Electronics Corporation ("Saturn"). This Court affirms.
 I
{¶ 2} Continental is a California corporation in the business of purchasing and liquidating used machinery and equipment. In the spring of 1995, Continental and H H Electronics ("H H") reached an agreement whereby Continental purchased all of the machinery and equipment located at H H's plant in Twinsburg, Ohio. Continental then prepared for a sale of the equipment by public auction on May 18, 1995.
{¶ 3} One of the items for sale at the auction was a Kinetico 30 GPM waste water recovery system ("Kinetico system"). The Kinetico system cleans and filters contaminated waste water that is a byproduct of, inter alia, the manufacturing of circuit boards for electronic equipment. One component of the Kinetico system filters copper, and other components filter additional metals such as tin and lead. At the time Continental purchased the equipment from H H, Continental agreed to allow H H to continue to use the Kinetico system to clean the H H facility. Accordingly, the catalog published by Continental which stated the terms of the auction sale specified that H H would continue to use the Kinetico system for approximately thirty days beyond the date of the auction, and that any sale of the Kinetico system was subject to this approximately thirty-day delay.
{¶ 4} The auction by Continental at H H was attended by Mr. Bhagu Patel, President and CEO of Amitron, and Ishvar Sutariya, Vice President of Saturn. Both Amitron and Saturn are manufacturers of circuit boards for electronic equipment. At the auction, no bids were received for the Kinetico system. On the day after the auction, Mr. Patel called Mr. Melvin A. Peters, President of Continental, and inquired as to whether the Kinetico system was still for sale. Mr. Peters responded that it was, and Mr. Patel and Mr. Peters entered into an agreement for the sale of the entire Kinetico System to Amitron for $15,000. In reaching the agreement, Mr. Peters advised Mr. Patel that Amitron could not take delivery of the system for approximately thirty days because of H H's continued need for the system. Both Mr. Peters and Mr. Patel understood that it was Amitron's responsibility to make arrangements to pick up the Kinetico system from H H. Mr. Patel accepted these conditions, and instructed another employee at Amitron to wire Continental the $15,000 purchase price. Upon receipt of the $15,000, Continental generated an auction invoice reflecting the sale of the Kinetico system to Amitron. The invoice provided that the Kinetico system would be ready for pick-up from H H on June 18, 1995. Continental forwarded the invoice to Amitron, and informed H H of the sale of the Kinetico system to Amitron.
{¶ 5} Soon after Amitron purchased the Kinetico system, Mr. Sutariya telephoned Mr. Peters and asked whether the Kinetico system was still for sale. Mr. Peters informed Mr. Sutariya that Continental sold the entire system to Amitron. Mr. Sutariya then contacted Mr. Patel, and inquired if Amitron was willing to sell the Kinetico system. Mr. Patel responded that Amitron needed the copper filtration components of the system, but was willing to sell the remaining parts, including the tin and lead filtration components. Mr. Patel and Mr. Sutariya reached an agreement that Amitron would sell part of the Kinetico system to Saturn for $15,000, and Saturn sent Amitron a check for the $15,000 purchase price.
{¶ 6} Mr. Patel and Mr. Sutariya then agreed to meet at H H to facilitate the division of the Kinetico system. At this meeting in early June, 1995, Mr. Patel and Mr. Sutariya physically marked some of the Kinetico system's components to identify which components would be distributed to which party.
{¶ 7} On approximately June 18, 1995, Mr. Patel telephoned H H to inquire whether the Kinetico system was ready to be picked up. H H responded that it needed the system for an additional several weeks. Mr. Patel agreed to allow H H to continue using the system, and instructed H H to call Amitron when it was finished using the system and Amitron could take delivery of it.
{¶ 8} On July 26, 1995, Mr. Sutariya sent a facsimile transmission to Amitron which requested Amitron to sign a statement that Saturn had purchased the entire Kinetico system from Amitron, and that Amitron authorized Continental to release the system to Saturn. Mr. Patel never signed the release, and never forwarded any written document to Continental or H H authorizing Saturn to take delivery of the system.
{¶ 9} On approximately July 27, 1995, Mr. Sutariya and other agents of Saturn arrived at the H H facility and began disassembling the Kinetico system. Saturn shipped some components of the system to Amitron, and distributed the remainder of the system to its own facilities. When Mr. Patel was made aware of the arrival of certain components of the system at Amitron, he determined that Saturn had retained more of the system's components than he had agreed to sell to Saturn. Mr. Patel also determined that the components delivered by Saturn did not constitute a functional copper filtration system, and that the parts delivered to Amitron were useless without additional components of the system. Amitron contacted Saturn and demanded the rest of the missing Kinetico system, and Saturn refused to deliver the rest of the system to Amitron.
{¶ 10} Amitron subsequently filed a complaint in the Summit County Court of Common Pleas, naming as defendants Continental and Saturn. The complaint alleged that Continental breached its oral agreement by failing to deliver the Kinetico system to Amitron. The complaint also alleged that Saturn 1) tortiously interfered with the oral agreement between Amitron and Continental, 2) tortiously converted the Kinetico system, and 3) breached its oral agreement with Amitron by taking more components of the Kinetico system than the parties mutually agreed upon. In addition to other relief, the complaint sought compensatory and punitive damages from Continental and Saturn.
{¶ 11} Pursuant to the parties' consent, the action was tried before a magistrate. At the close of Amitron's case, Continental and Saturn moved to dismiss Amitron's claims pursuant to Civ.R. 41(B)(2). The magistrate granted the motion as to the claim against Continental, but denied the motion as to Amitron's claims against Saturn. At the conclusion of the trial, the magistrate entered his decision pursuant to Civ.R. 53, in which he concluded that judgment should be rendered in favor of Saturn. The trial court thereafter adopted the decision of the magistrate, and entered final judgment in favor of Saturn. Amitron has timely appealed, asserting four assignments of error.
 II
{¶ 12} When an appellant challenges a judgment in a civil case as against the manifest weight of the evidence, an appellate court's standard of review is the same as that in a criminal context. Frederickv. Born (Aug. 21, 1996), 9th Dist. No. 95CA006286, at 14. In determining whether a conviction is against the manifest weight of the evidence, this Court must:
 {¶ 13} "[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten
(1986), 33 Ohio App.3d 339, 340.
{¶ 14} An appellate court that overturns a trial court's judgment as against the manifest weight of the evidence acts in effect as a "thirteenth juror," setting aside the resolution of testimony and evidence as found by the trier of fact. State v. Thompkins (1997),78 Ohio St.3d 380, 387. This action is reserved for the exceptional case where the evidence presented weighs heavily in favor of the defendant.Otten, 33 Ohio App.3d at 340. "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." State v. Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at 14, appeal not allowed (2000), 88 Ohio St.3d 1482. Additionally, it is well established that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 Assignment of Error Number One {¶ 15} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADOPTING THE MAGISTRATE'S DECISION DISMISSING [CONTINENTAL], WHERE THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT [CONTINENTAL] BREACHED THE CONTRACT WITH [AMITRON]."
{¶ 16} In its first assignment of error, Amitron has argued that the trial court erred in adopting the magistrate's decision that dismissed Amitron's breach of contract claim against Continental. Amitron has contended that the decision was contrary to the manifest weight of the evidence, which established that Continental breached its oral agreement with Amitron by failing to tender delivery of the entire Kinetico system to Amitron.
{¶ 17} Civ.R. 41(B)(2) provides:
 {¶ 18} "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."
{¶ 19} In ruling on a motion for involuntary dismissal pursuant to Civ.R. 41(B)(2), the trial court weighs the evidence, resolves any conflicts therein, and may render judgment in favor of the defendant if the plaintiff has shown no right to relief. Ramco Specialties, Inc. v.Pansegrau (1998), 134 Ohio App.3d 513, 520. "Where plaintiff's evidence is insufficient to sustain plaintiff's burden in the matter, the trial court may dismiss the case." (Emphasis sic.) In re Estate of Fugate
(1993), 86 Ohio App.3d 293, 297. A reviewing court will not reverse a dismissal pursuant to Civ.R. 41(B)(2) unless the trial court's decision is incorrect as a matter of law or is against the manifest weight of the evidence. Johnson v. Tansky Sawmill Toyota (1994), 95 Ohio App.3d 164,167.
{¶ 20} In the case sub judice, there is no dispute that Amitron and Continental entered into an enforceable agreement for the sale of the Kinetico system to Amitron. The parties have likewise agreed that R.C. Chapter 1302 governs the duties of each party to the agreement. R.C.1302.14 sets forth the general obligations of the parties: "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." R.C. 1302.47(A) elaborates on the duty of the seller to tender delivery to the buyer: "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery."
{¶ 21} Amitron has argued that Continental breached its agreement by failing to tender delivery to Amitron, and instead allowing Saturn a stranger to the agreement — to divide and ship the system. However, the evidence at trial established that Amitron and/or Saturn engaged in a series of negotiations and agreements that altered the obligations of Continental under its agreement with Amitron. The invoice generated by Continental provided that the Kinetico system could be picked up from H H on June 18, 1995. Through a series of agreements reached between H H and Amitron and/or Saturn, that delivery date was prolonged for several weeks. Continental, however, was not a party to these negotiations or agreements, and Mr. Peters testified that he was unaware of any problems with delivery of the system until Continental received a fax from Amitron in August 1995, indicating that Amitron never received the system. Moreover, evidence was presented at trial that H H was aware that Saturn had purchased part of the system from Amitron, and that Mr. Patel told an employee at H H that Mr. Sutariya and his agents were going to disassemble and pick up the system from H H.
{¶ 22} Evidence of such agreements independently negotiated by Amitron and Saturn led the magistrate to conclude:
 {¶ 23} "[E]ven though Continental as a general proposition had a responsibility to ensure proper delivery was tendered to the proper party, the failure was not as a result of any activities of Continental or its employees, agents, or officials. Rather, the failure to have any proper delivery was the direct result of the intentional, conscious actions of Mr. Sutariya and Mr. [Patel] in their wranglings and discussions about how to deal with the breakup of the Kinetico system and the subsequent delivery to the respective entities."
{¶ 24} Given the testimony concerning the changes to the agreement brought about by Amitron's involvement of Saturn in the division and delivery of the Kinetico system, we cannot agree with Amitron that the dismissal of its claim against Continental was incorrect as a matter of law or contrary to the manifest weight of the evidence. Amitron's first assignment of error is without merit.
 Assignment of Error Number Two {¶ 25} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADOPTING THE MAGISTRATE'S DECISION THAT [AMITRON] FAILED TO SUSTAIN ITS BURDEN OF PROOF WHERE THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT [SATURN] IS LIABLE FOR CONVERSION OF [AMITRON'S] PROPERTY."
 Assignment of Error Number Three {¶ 26} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADOPTING THE MAGISTRATE'S DECISION THAT [AMITRON] FAILED TO SUSTAIN ITS BURDEN OF PROOF WHERE THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT [SATURN] IS LIABLE FOR BREACH OF THE ORAL AGREEMENT WITH [AMITRON]."
{¶ 27} In its second and third assignments of error, Amitron has argued that the trial court erred in entering judgment in favor of Saturn on Amitron's claims for breach of contract and conversion. Amitron has contended that the determination that Amitron was not entitled to recovery on either of these claims was against the manifest weight of the evidence.
{¶ 28} Saturn has maintained that the trial testimony showed that Amitron and Saturn agreed that Amitron would receive the "complete operational copper system." However, the disputed terms of the agreement between Amitron and Saturn as to which components of the Kinetico system Amitron sold to Saturn, and who would take delivery of the system from H H, were at the heart of the entire litigation. The trial testimony of Messrs. Patel and Sutariya on these crucial points, in addition to being directly contradictory, was characterized by the magistrate as containing "massive inconsistencies" in relation to each party's respective responses to discovery requests.
{¶ 29} For example, Mr. Patel testified that in his initial conversation with Mr. Sutariya, during which they agreed on the sale of certain parts of the system to Saturn, the parties agreed that Amitron would pick up the system from H H. Mr. Patel testified that he and Mr. Sutariya agreed that Mr. Patel would then telephone Mr. Sutariya, and Saturn would pick up from Amitron's facility those parts of the system that it had purchased from Amitron. In deposition testimony, Mr. Patel categorically denied ever returning to H H's Twinsburg facility and meeting with Mr. Sutariya after the auction on May 18, 1995. When certain photographs were produced at trial showing the identifying marks Mr. Patel and Mr. Sutariya had put on various parts of the system in June 1995, however, Mr. Patel admitted that he had met Mr. Sutariya at H H to discuss the division of the system.
{¶ 30} Mr. Sutariya, on the other hand, testified that at the meeting with Mr. Patel at H H to settle the division of the system, both parties agreed that Saturn would pick up the entire system and ship to Amitron the copper filtration components. Mr. Sutariya also testified that at the meeting at H H, Mr. Patel told an H H employee that Mr. Sutariya and Saturn's agents were going to come to H H and dismantle and ship the system. In addition, Mr. Sutariya testified that he spoke to an officer at H H on July 26, 1995, and the officer told Mr. Sutariya that he was aware from conversations with Mr. Patel that Saturn had purchased part of the system from Amitron. However, Mr. Sutariya had neglected to describe these communications and other alleged conversations with Mr. Patel in response to Amitron's pretrial deposition questions and interrogatories.
{¶ 31} In short, the record strongly supports the magistrate's finding that "the testimony of Mr. [Patel] and Mr. Sutariya at many points lacked credibility [and] at times gave the appearance of being contrived." In addition, the testimony of both corporate representatives with respect to the terms of the agreement of sale was directly contradictory. Having heard the testimony and observed the demeanor of the witnesses, the magistrate was in the best position to assess their credibility. See Jackson v. Jackson (1997), 137 Ohio App.3d 782, 797. We agree with the magistrate's conclusion that:
 {¶ 32} "Amitron had the burden to establish what the exact terms of the contract were[.] * * * It must be concluded that liability has not been established inasmuch as the terms of who was to get what are at best extremely vague and unclear. It is not the responsibility of the reviewing tribunal to insert contract items or otherwise guess about what was intended by the contract."
{¶ 33} Amitron's failure to establish the terms of its agreement with respect to the division and delivery of the system is dispositive of both its second and third assignments of error. Amitron's failure to establish which components of the system Mr. Patel and Mr. Sutariya agreed to distribute to Amitron is fatal to Amitron's claim that Saturn breached that agreement by not delivering to Amitron all the components it contracted to receive. In addition, the establishment of which parts of the system Amitron was entitled to receive under the agreement is a necessary predicate to its claim that Saturn converted certain parts of the system by failing to deliver them to Amitron. Accordingly, Amitron's second and third assignments of error are without merit.
 Assignment of Error Number Four {¶ 34} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADOPTING THE MAGISTRATE'S DECISION IN FAVOR OF [CONTINENTAL AND SATURN] WHERE THE MANIFEST WEIGHT OF THE EVIDENCE ESTABLISHES THAT [CONTINENTAL AND SATURN] ARE LIABLE TO [AMITRON] FOR THE VALUE OF THE GOODS AND FOR ITS INCIDENTAL AND CONSEQUENTIAL DAMAGES."
{¶ 35} In its fourth assignment of error, Amitron has contended that the trial court erred in dismissing its claim against Continental and entering judgment in favor of Saturn. Amitron has argued that the trial court's decision was against the manifest weight of the evidence, which established that Continental and Saturn were liable to Amitron for the value of the system as well as Amitron's incidental and consequential damages.
{¶ 36} Given our disposition of Amitron's first three assignments of error, we need not further address Amitron's arguments regarding the amount of damages it is entitled to recover. See App.R. 12(A)(1)(c).
 III
{¶ 37} Amitron's assignments of error are overruled. The judgment of the trial court is affirmed.
BAIRD, P.J., CARR, J. CONCUR.